# Exhibit A

## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2015-CFPB- 0022

In the Matter of:

Encore Capital Group, Inc., Midland
Funding, LLC, Midland Credit
Management, Inc. and Asset Acceptance
Capital Corp.,

**CONSENT ORDER**

## I

## Overview

The Consumer Financial Protection Bureau ("Bureau") has reviewed the practices

of Encore Capital Group, Inc. ("Encore Capital"), Midland Funding, LLC ("Midland"),

Midland Credit Management, Inc. ("MCM"), and Asset Acceptance Capital Corp.

("Asset")(collectively "Encore" or "Respondents"), regarding its purchase of charged-off

Consumer Debts from original Creditors and other Debt buyers, and its subsequent

collection efforts including filing lawsuits against Consumers, and has identified

violations of Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of

2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a)(1); Sections 805(a)(1), 806, 806(5),

807, 807(2)(A), 807(5), 807(8), and 807(10) of the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. §§ 1692c(a)(1), 1692d, 1692d(5), 1692e, 1692e(2)(A), 1692e(5),

1692e(8), and 1692e(10); Sections 623(a)(8)(E) and 623(b) of the Fair Credit Reporting

Act ("FCRA"), 15 U.S.C. §§ 1681s-2(a)(8)(E) and 1681s-2(b).  Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## II

### Jurisdiction

1.      The Bureau has jurisdiction over this matter under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, Section 814(b) of the FDCPA, 15 U.S.C. § 1692l(b), and Section 621(b)(1)(H) of the FCRA, 15 U.S.C. § 1681s(b)(1)(H).

## III

### Stipulation

2.      Respondents have executed a "Stipulation and Consent to the Issuance of a Consent Order," (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondents have consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondents admit the facts necessary to establish the Bureau's jurisdiction over Respondents and the subject matter of this action.

## IV

### Definitions

The following definitions must apply to this Consent Order:

3.      "Board" means the duly elected and acting Boards of Directors of Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc., and Asset

Acceptance Capital Corp.

4.      "Charge-off" means the treatment of a receivable balance by a Creditor as a loss or expense because payment is unlikely.

5.      "Charge-off Balance" means the amount alleged due on an account receivable at the time of Charge-off.

6.      "Clearly and prominently" means:

      a. as to written information, written in a type size and location sufficient for an ordinary Consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary Consumer. If the information is contained in a multi-page print document, the disclosure appears on the first page; and

      b. as to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary Consumer to hear and comprehend.

7.      "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

8.      "Creditor" means any person who offers or extends credit creating a Debt or to whom a Debt is owed, but such term does not include any person to the extent that that person receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such Debt for another.

9.      "Debt" means any obligation or alleged obligation of a Consumer to pay

money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

10.     "Effective Date" means the date on which this Consent Order is issued.

11.     "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegee.

12.      "Original Account-Level Documentation" means

    a.  any documentation that a Creditor or that Creditor's agent (such as a servicer) provided to a Consumer about a Debt;

    b.  a complete transactional history of a Debt, created by a Creditor or that Creditor's agent (such as a servicer); or

    c.  a copy of a judgment, awarded to a Creditor or entered on or before the Effective Date.

13.     "Legal Collection" means any collection efforts made by any internal legal department or a third-party law firm to collect a Debt owed or allegedly owed to Encore, including but not limited to sending letters on law firm letterhead and filing Debt collection lawsuits, but does not include any post-judgment collection efforts.

14.     "Encore" means Encore Capital Group, Inc., as well as its current (as of the Effective Date) or former, direct or indirect, affiliates, subsidiaries, parents, divisions, or branches, and all of their successors and assigns, that are directly or indirectly engaged in the purchase, transfer, or collection of U.S. Consumer receivables, including, but not limited to, Midland Funding, LLC, Midland Credit Management, Inc., and Asset

Acceptance Capital Corp.

15.    "Related Consumer Action" means a private action by or on behalf of one or more Consumers or an enforcement action by another government agency brought against Encore based on substantially the same facts as set forth in Section V of this Consent Order.

16.    "Relevant Time Period" means the period from July 21, 2011 to the Effective Date.

17.    "Restitution Eligible Consumer" means any identified Consumer in the population of Consumers identified in Paragraphs 144 and 145 who made a payment, directly or indirectly, to Encore during the Relevant Time Period.

18.    "Time-Barred" when used to describe a Debt means any Debt that is beyond an applicable statute of limitations for a Debt collection lawsuit.

**V**

**Bureau Findings and Conclusions**

The Bureau finds the following:

19.    Midland, MCM, and Asset are wholly-owned subsidiaries of Encore Capital and share common officers and directors with Encore Capital. Midland and MCM operate in concert with one another, and under the direct supervision and control of Encore Capital, to purchase and collect Consumer Debt on a massive scale. Asset was purchased by Encore in June 2013 and is currently a wholly-owned subsidiary of Encore. Encore is one of the largest Debt buyers and collectors in the United States. From 2009 to 2015, Encore's estimated gross collections totaled over $5 billion, with net income of more than

$384 million.

20.    At all times relevant to this Consent Order, Encore Capital, Midland, MCM, and Asset have collected Debt related to Consumer financial products or services. Accordingly, each Respondent is a "covered person" as defined by the CFPA, 12 U.S.C. § 5481(6).  See also 12 U.S.C. § 5481(5) and (15)(A)(x).  Each Respondent is also a "debt collector" as defined in Section 803(6) of the FDCPA.  15 U.S.C. § 1692a(6). Midland, MCM, and Encore Capital are also each a person who "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies" about Respondents' "transactions or experiences" with Consumers, as described in Section 623(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(2)(A), and are each a "furnisher" as defined in Regulation V, 12 C.F.R. 1022.44(c).

21.    Encore sends collection letters by United States mail, calls Consumers from call centers in the United States, India, and Costa Rica, furnishes Consumer information to credit bureaus, and sues Consumers in state courts across the country. The vast majority of the Debt collection lawsuits Encore files go unanswered by Consumers and result in default judgments.

## ENCORE'S DEBT BUYING PRACTICES

22.    Encore purchases portfolios of old Consumer Debt from some of the nation's largest Consumer finance and telecommunications companies, and from other Debt buyers, for pennies on the dollar. These Debts primarily consist of charged-off Consumer credit card and telecommunications Debts, purchased at various points in time from the date of default. From 2009 to 2015, Encore paid about $4 billion for

approximately 60 million Consumer accounts with a total face value of $128 billion.

23.   When Encore purchases Debt portfolios, it has typically received an electronic spreadsheet, sometimes referred to as a "data file," from the seller that includes information about the Consumer, such as name, address, social security number, and information about the Debt, including the purported amount of the Debt, contract interest rate, and dates of origination and default.

### Sellers Disclaim the Accuracy and Enforceability of Debt They Sold to Encore

24.   Encore's purchase agreements with Debt sellers have typically limited, in varying degrees, the seller's responsibility for the accuracy and validity of the accounts in question. For example, a purchase agreement between Midland Funding and one large credit card issuer informed Encore that the account balance for over 35,000 individual accounts being sold in that transaction was an approximation:

> Current balance means the approximate unpaid balance. [Midland Funding] acknowledges that the figure provided as the current balance for any loan may include interest, accrued or unaccrued, costs, fees, and expenses, and it is possible that the figure provided as the current balance for any loan may not reflect credits for payments made by or on behalf of any obligor prior to the cutoff date.

25.   Other purchase agreements, such as one between Midland Funding and a large retailer, put Encore on notice that some of the accounts are likely past the applicable statutes of limitations for litigation or were previously disputed by Consumers:

> [Midland Funding] understands that Sellers believe but have not verified, that the statutes of limitations may have run on some but not all of the accounts.

> [Midland Funding] acknowledges that some accounts or certain transactions posted to some accounts may be subject to actual or potential claims or disputes by obligors against one or both of the Sellers or their affiliates.

26.    In another example, a purchase agreement between Asset and a large finance company informed Encore that:

> [S]ome Accounts, or certain transactions posted to some Accounts, may be subject to actual or potential claims or disputes by Obligors against one or both of the Sellers or their affiliates... [Asset] understands that Sellers believe, but have not verified, that statutes of limitation may have run on some, if not all, of the Accounts.

27.    Debt sellers making these types of disclosures typically did not inform Encore which individual accounts in a given portfolio contain an approximate balance, are past the applicable statute of limitations for litigation, past the date of obsolescence for credit reporting, or were previously disputed by a Consumer.

28.    Debt purchase agreements have typically contained recitals that Encore is purchasing Consumer accounts after having conducted an independent evaluation as to the enforceability and collectability of the sold accounts.

29.    However, the only investigation typically taken by Encore prior to a Debt portfolio purchase has been to review the data file for facial anomalies such as a default date preceding an account open date or a Social Security number that is obviously a placeholder (e.g., made up of all the same numbers).

30.    In numerous instances, Debt sellers have provided data files to Encore containing inaccurate information as to the identity of the Consumer obligated to pay the Debt, the age of the Debt, the amount of the Debt, the interest rate, and other material information about the Debt. Nevertheless, Encore has continued purchasing Consumer Debt from these sellers.

31.    For example, from at least February 2010 to June 2013, one large credit

card bank sold Encore over 10,000 individual Consumer accounts with data files containing overstated interest rates. To date, Encore has continued to purchase Debt from this bank, knowing that records from this bank have been inaccurate to the detriment of the borrowers, without reviewing any account level documentation to verify that the information being provided by this seller is accurate.

**Sellers Disclaim the Availability of Documentation**
**to Evidence the Debt they Sold to Encore**

32.    Sellers typically have not provided Encore with any Consumer-level documentation about most individual Debts, such as account statements, records of payments, and the underlying contracts signed by the Consumers. Instead, if desired, Encore has had to order these documents from sellers, often at an additional cost to Encore.

33.    Further, purchase agreements typically state that sellers will provide documentation to evidence the Debt only "to the extent it is available." Some purchase agreements state that the seller will not provide any account level documents for certain portfolios or that documentation is available for only a percentage of the accounts and that sellers will not be in breach of their agreement with Encore because they cannot provide documentation.

34.    When Debt sellers have informed Encore in purchase agreements that documentation is only available for some accounts, they did not inform Encore which individual accounts in a given portfolio cannot be supported by account-level documentation.

35.    In numerous instances, sellers have been unable to provide documentation

2015-CFPB-0022    Document 1    Filed 09/09/2015    Page 10 of 63

to Encore evidencing Consumers' responsibility for Debt Encore was collecting. Nevertheless, Encore has continued purchasing Consumer Debt from these sellers and collecting on that Debt without first conducting any investigation to determine whether the information in the data files is accurate.

<u>ENCORE'S PRACTICES RELATING TO CONSUMER DISPUTES</u>

36.    Encore has received an average of 30,000 written disputes and complaints and 10,000 oral disputes and complaints directly from Consumers in a typical month relating to Encore's Debt collection and credit reporting. Another approximately 100,000 Consumer disputes have come to Encore in a typical month through e-OSCAR, the web-based communications system used by the nationwide Consumer reporting agencies to communicate with data furnishers regarding Consumer disputes.

37.    Encore has generally relied on Consumers to inform Encore when it was attempting to collect Debt based on inaccurate or erroneous information. It has required Consumers to report such disputes in writing within 45 days after Encore sends them a notice of Debt under Section 809 of the FDCPA ("Notice of Debt"). According to Encore's written policies and procedures, Encore requests account-level documentation from the seller of the Debt if Encore receives a written dispute from a Consumer within 45 days of sending a Notice of Debt.

38.    Encore has considered disputes received outside of 45 days "untimely" and has directed personnel responsible for handling these disputes not to investigate the disputes by requesting documentation from sellers but rather to "[i]nform the consumer that proof is required to support their claim."

Page 10 of 63

39.   Before Encore has investigated "untimely" claims that the Consumer previously paid the Debt, Encore has required the Consumer to produce a copy of a letter from a previous Debt owner stating that the Debt had been paid or settled, or a copy of the front and back of a canceled check along with a copy of a settlement offer in the same amount.

40.   Before Encore has investigated "untimely" claims that Encore was collecting an inaccurate amount, Encore has required the Consumer to produce a letter of investigation from the original Creditor, a copy of correspondence between the Consumer's attorney and the original Creditor, or a copy of account-level documentation, such as a monthly credit card statement dated after the account was charged-off, showing the balance alleged by the Consumer.

41.   Before Encore has investigated "untimely" claims that Encore is collecting from the wrong person, Encore has required the Consumer to produce a notarized affidavit swearing that the Consumer is a victim of identity theft, a police report, or a letter from the credit issuer determining that there was a fraud on the account.

42.   In numerous instances, Encore has told Consumers submitting "untimely" disputes that under the FDCPA, the Consumer has the burden of proving that he or she does not owe a Debt. Encore has often made this representation while threatening legal action and in response to disputes made under the FCRA.

43.   Encore collects disputed Debt itself and also assigns disputed Debt to law firms and third-party Debt collectors. In numerous instances, Encore has assigned disputed Debt to law firms and third-party Debt collectors without informing them that

the Debt is disputed and without forwarding correspondence it has received from Consumers in support of their disputes. As a result, law firms evaluating Encore accounts for litigation did not know which accounts are disputed, and disputing Consumers have been forced to re-start the dispute process each time Encore transfers a Debt.

44.     In numerous instances, Encore has instructed its law firms to abide by its dispute policies and only to close accounts with "untimely" disputes if the Consumer provides proof that he or she does not owe the Debt. This is even the case where documentation produced to Encore by a seller indicates that the Consumer does not owe a Debt. For example, Encore instructed one law firm to continue collecting on more than fifty accounts unless the Consumers could provide independent proof that the accounts had been paid, even though the monthly statements provided by the Debt sellers showed a zero balance.

ENCORE COLLECTS DEBT WITHOUT A REASONABLE BASIS

45.     Despite the indicators described above regarding the inaccuracy of information produced by Debt sellers, Encore has generally relied upon the summary data files as the sole basis for its collection efforts and has only attempted to obtain account-level documentation evidencing the Debt in certain limited circumstances. Even when Encore has already been in possession of account-level documentation regarding the Debts it has collected, Encore generally did not review the documentation to ensure it was consistent with information in the data file.

46.     Encore has made the same claims to Consumers regarding Debt purchased from portfolios Encore has had reason to believe may contain inaccurate information as it

Page 12 of 63

did regarding Debt purchased from more reliable sources. Encore has made the same claims to Consumers regarding Debt that Encore knew or had reason to believe cannot be supported by account-level documentation available to Encore as it did regarding Debt that can be supported by such documentation.

47.     Consumers being contacted by Encore regarding these Debts did not know that Encore knew or had reason to believe the information forming the basis for the claim may be inaccurate or unsupportable by underlying documentation. Consumers contacted by Encore regarding these Debts did not know when Encore knew or had reason to believe it lacked access to account-level documentation to support the claim.

## ENCORE'S LITIGATION PRACTICES
### Scattershot Litigation

48.     Encore has filed hundreds of thousands of lawsuits to collect Consumer Debt. Most of the Consumers sued by Encore are not represented by counsel. Encore has placed tens of thousands of accounts with law firms staffed by fewer than ten attorneys. For example, Encore placed over 100,000 accounts with Frederick J. Hanna and Associates, while that firm employed 16 attorneys. Encore has encouraged these law firms to file lawsuits on a large percentage of accounts, prohibited them from contacting previous owners of the Debt for account-level documentation, and discouraged them from requesting account-level documentation Encore did not deem necessary to settle a case or obtain a judgment.

49.     Prior to Encore Capital's purchase of Asset, much of Asset's legal collections were handled by a 24 attorney Debt collection law firm that operates in 12 states. This firm collected over $50,000,000 for Asset from October 2011 to October 2012, while

suing or threatening to sue approximately half a million Consumers allegedly indebted to Asset.

50.    When deciding whether to threaten or file suit, Encore's law firms have not known if a Debt seller has specifically disclaimed the accuracy of information in the data file, has notified Encore that documentation is unavailable or has notified Encore that a number of accounts in a portfolio are disputed or barred by the applicable statute of limitations. Law firms also have not known if the Consumer had disputed the Debt with Encore or provided detailed letters or documentary evidence questioning the validity of Encore's claim.

51.    In most states, Encore has threatened and filed suit before verifying that account-level documentation exists to substantiate its claim in court. In numerous instances, Encore has filed suit after requests for account-level documentation have been denied.

52.    Even when Encore has been able to obtain account-level documentation, that evidence is sometimes unreliable or inconsistent with information in the data file, or with the facts alleged in Encore's lawsuits.

53.    When Consumers have contested Encore's claims and Encore has lacked the account-level documentation necessary to obtain a judgment, Encore has instructed its attorneys to make one final attempt to convince the Consumer to settle before dismissing the claim.

<u>Misleading Affidavits</u>

54.    In many jurisdictions, Encore has been able to obtain a settlement or a

default judgment against a Consumer using an affidavit as its only evidence. Many of these affidavits contain false or misleading testimony.

55.    For example, from at least 2011 to 2014, Encore has obtained tens of thousands of judgments against Consumers by submitting sworn affidavits representing that the Consumer defendants did not file a timely written dispute pursuant to Section 809 of the FDCPA and stating that pursuant to the FDCPA, the Debt is therefore "assumed valid."

56.    In fact, Section 809(a)(3) of the FDCPA states that a Debt collector's Notice of Debt must inform a Consumer that Debts will be "assumed to be valid *by the debt collector*" (emphasis added) if they are not disputed pursuant to that section. Section 809(c) of the FDCPA expressly states that "[t]he failure of a consumer to dispute the validity of a debt [after receiving a notice under Section 809 from the collector] may not be construed by any court as an admission of liability by the consumer." 15 U.S.C. § 1692g(c).

57.    In thousands of cases, for which Encore possessed no account-level documentation evidencing the Consumer's responsibility for the Debt, Encore obtained a settlement or judgement based solely on an affidavit referencing the Consumer's failure to dispute the Debt.

58.    Encore has routinely submitted affidavits without attaching supporting documentation, in which the affiant swears that he or she has reviewed account-level business records concerning the Consumer's account when that is not the case.

59.    However, in most instances, these representations have been made when

affiants have merely reviewed a computer screen containing the scant information produced by sellers in data files and not after a review of any account level documents such as account applications, terms and conditions of contracts, payment histories, monthly credit card statements, charge slips, or bills of sale reflecting Encore's ownership of the account.

60.     Encore has routinely requested and used affidavits from sellers that contain false or misleading statements regarding the seller's review of unattached records.  For example, numerous Encore purchase agreements with credit issuers and other Debt buyers provide that "[i]n the event Seller does not provide any of the account documents on a particular account, [Encore] may request an affidavit" containing the following language: "The statements in this affidavit are based on the computerized and *hard copy records* of the Seller…" (emphasis added).

61.     According to an Encore senior manager responsible for negotiating Debt purchase agreements, the ability to request affidavits from sellers that purport to be based on a review of documentation is negotiated by Encore "[a]s a safeguard, should documentation not exist, [so] we have some form of evidence from the seller." A director of Encore's Debt purchasing department has instructed Encore management to "reinforce that these affidavits are intended to provide documentation when other media is not available."

62.     Encore has routinely submitted business records affidavits in which affiants swear that attached documentation relates to individual Consumers' accounts.

63.     However, in many instances, the attached documentation, which sometimes

included generic credit card agreements created years after the Consumer purportedly defaulted on the agreement, does not in fact relate to the Consumer being sued.

64.    Finally, in numerous instances from at least 2009 to 2011, Encore submitted affidavits in which affiants misrepresented that they had personal knowledge of facts contained in affidavits, including that the Consumer owed a Debt.

ENCORE'S COLLECTION OF TIME-BARRED DEBT

65.    Encore and its law firms typically have failed to review account-level documents to determine the age of the accounts they collect, relying solely on information in the data file, even if Encore or one of its law firms has been on notice that some of the information in a data file is inaccurate or if Encore has known that some of the Debts in a specific portfolio are barred by the applicable statute of limitations.

66.    In numerous instances, Encore has threatened and filed suit on Debt that was past the applicable statute of limitations.

67.    Encore has not tracked when Consumers assert limitations defenses or how often any of its third-party law firms file lawsuits outside the applicable statute of limitations.

68.    Encore has trained its collectors to "create urgency" when collecting Time-Barred Debt through telephone calls. For example, for one portfolio Encore knew contained a high percentage of Time-Barred Debt, collectors were instructed to "[e]ducate [the] consumer, as to how nonpayment of bill will impact him," by telling him "[i]t is important for me to establish your intentions towards the bill or else it will be taken as your refusal to resolve" after which the account will be "forwarded for further

Page 17 of 63

2015-CFPB-0022    Document 1    Filed 09/09/2015    Page 18 of 63

management review" so that "further collection activities will be decided."

69.    In numerous instances from at least July 21, 2011 to March 31, 2013, Encore sent thousands of letters containing time-limited "settlement" offers that failed to disclose that the Debt it was collecting was too old for litigation and that implied a legally enforceable obligation to pay the Debt.

### ASSET'S HARASSING TELEPHONE CALLS TO CONSUMERS

70.    In numerous instances, from 2009 to 2014, Asset has called Consumers repeatedly or continuously. Such calls had the effect of abusing or harassing consumers or other persons at the called numbers.  For example, Asset called numerous Consumers more than 20 times over just one two day period.

71.    In numerous instances, from 2009 to 2014, Asset called Consumers at a time it knew or should have known to be inconvenient to the Consumer, such as early in the morning or late at night. For example, Asset made thousands of calls to Consumers before 8:00 a.m. or after 9:00 p.m., in the time zones associated with the addresses on file in Asset's own records.

72.    Asset's continuous and inconvenient calls caused, or were likely to cause, Consumers to suffer emotional distress. Some Consumers, including those who disputed the Debt, made, or were likely to have made, payments to Asset solely to temporarily stop the excessive and inconvenient calls. As a result of Asset's excessive and inconvenient calls, Consumers who lacked the ability to repay Asset while meeting their other financial obligations, placed, or were likely to have placed, a higher priority on unsecured old credit card Debt than on expenses for monthly living expenses.

## Violations of the Consumer Financial Protection Act

73. Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

74. Encore Capital, Midland, MCM, and Asset are each a "covered person" within the meaning of the CFPA, 12 U.S.C. § 5481(6).

75. Respondents made numerous representations to Consumers in connection with attempting to collect Debts, a Consumer financial product or service, 12 U.S.C. §§ 5481(5), (15)(x).

76. An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a Consumer acting reasonably under the circumstances.

77. An act or practice is unfair under the CFPA if (1) it causes or is likely to cause substantial injury to Consumers; (2) such injury is not reasonably avoidable by Consumers; and (3) such injury is not outweighed by countervailing benefits to Consumers or to competition.

### False or Unsubstantiated Representations About Owing a Debt

78. In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Encore with certain unpaid balances, interest rates, and payment due dates. Encore further represented to Consumers directly or indirectly, expressly or by implication, that Encore had a reasonable basis for representing that Consumers owed the claimed Debts to Encore.

79.    In truth and in fact, in numerous instances the representations set forth in Paragraph 78 were false or were not substantiated at the time the representations were made, including but not limited to where:

a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Encore failed to review information that would have been necessary to have a reasonable basis to continue collecting on that account; or

b.    Encore had knowledge or reason to believe, based on Encore's past course of dealing with the seller or the seller's accounts (including factors such as Consumer disputes, inaccurate or incomplete information in the portfolio, and contractual disclaimers related to the accounts) that a specific portfolio of the seller's accounts might contain unreliable data, but continued to represent that Consumers owed the claimed amount on the accounts in question without obtaining and reviewing additional information that would provide a reasonable basis for such claims.

80.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead Consumers acting reasonably under the circumstances.

81.    The representations set forth in Paragraph 78 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

**Misrepresenting that Encore Intends
to Prove the Debt, If Contested**

82.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Encore represented, directly or indirectly, expressly or by implication, that Encore intends to

prove its claims, if contested.

83.    In truth and in fact, in numerous instances, Encore does not intend to prove its claims, if contested.

84.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

85.    The representations set forth in Paragraph 82 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Filing Misleading Collection Affidavits

86.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, in affidavits filed in courts across the country, Encore represented directly or indirectly, expressly or by implication, that:

    a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are presumed valid by a court;

    b.    Encore affiants had reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;

    c.    Debt seller affiants had reviewed hard copy records corroborating the Consumer's Debt;

    d.    Documents attached to affidavits were specific to the Consumer; or

    e.    Encore affiants had personal knowledge of the individual Consumer's indebtedness.

87.    In truth and in fact:

    a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are not presumed valid by a court, because pursuant to Section 809(c) of the

Page 21 of 63

FDCPA, "[t]he failure of a consumer to dispute the validity of a debt [after receiving a notice under Section 809] may not be construed by any court as an admission of liability by the consumer";

b.   In numerous instances, Encore affiants had not reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;

c.   In numerous instances, Debt seller affiants had not reviewed hard copy records corroborating the Consumer's Debt;

d.   In numerous instances, documentation attached to affidavits was not specific to the Consumer; and

e.   In numerous instances, Encore affiants did not have personal knowledge of the individual Consumer defendant's indebtedness.

88.   These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

89.   The representations set forth in Paragraph 86 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresentations Regarding Time-Barred Debt

90.   In numerous instances, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

91.   In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

92.   These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt claim and are likely to mislead Consumers acting reasonably under the circumstances.

93.   The representations set forth in Paragraph 90 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresenting to Consumers That They Have the Burden of Proof in Litigation

94.   In numerous instances, in connection with collecting or attempting to collect Debt through litigation or threats of litigation, Encore represented to Consumers, directly or indirectly, expressly or by implication, that under the FDCPA, the failure to dispute a Debt in writing within a certain period of time shifts the legal burden to Consumers to prove in court that they do not owe a Debt to Encore.

95.   In truth and in fact, under the FDCPA, the failure to dispute a Debt in writing within a certain period of time does not shift the legal burden to Consumers to prove in court that they do not owe a Debt.

96.   The representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

97.   The representations set forth in Paragraph 94 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Excessive and Inconvenient Calls

98.    In numerous instances, in connection with collecting or attempting to collect Debt, Asset made an excessive number of telephone calls to Consumers and made calls at times Asset knew or should have known were inconvenient to Consumers.

99.    The acts or practices set forth in Paragraph 98 caused or were likely to cause substantial injury that was not reasonably avoidable by Consumers or outweighed by countervailing benefits to Consumers or to competition and constitute unfair acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Violations of the Fair Debt Collection Practices Act

100.    Section 805(a)(1) of the FDCPA, 15 U.S.C. § 1692c(a)(1), prohibits Debt collectors from communicating with Consumers in connection with the collection of any Debt at any unusual time or place or a time or place known or which should be known to be inconvenient to the Consumer.  Section 806 of the FDCPA, 15 U.S.C. § 1692d, prohibits Debt collectors from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a Debt. Section 806(5) of the FDCPA, 15 U.S.C. § 1692d(5), specifically prohibits Debt collectors from causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number. Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits Debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any Debt. Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A) specifically prohibits the false representations of the character, amount, or legal status of

any Debt. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5) specifically prohibits the threat to take any action that cannot legally be taken or that is not intended to be taken. Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8), prohibits communicating or threatening to communicate to any person credit information that is known or which should be known to be false, including the failure to communicate that a disputed Debt is disputed. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), prohibits using false representations or deceptive means to collect or attempt to collect any Debt or to obtain information concerning a Consumer.

101.    Midland, MCM, Asset, and Encore Capital are each a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6).

102.    Encore made numerous telephone calls and representations to Consumers in connection with attempting to collect Debts arising out of transactions primarily for personal, family, or household purposes.

### False or Unsubstantiated Representations About Owing a Debt

103.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Encore with certain unpaid balances, interest rates, and payment due dates. Encore further represented to Consumers directly or indirectly, expressly or by implication, that Encore had a reasonable basis for representing that Consumers owed the claimed Debts to Encore.

104.    In truth and in fact, in numerous instances the representations set forth in Paragraph 103 were false or were not substantiated at the time the representations were

made, including but not limited to where:

    a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Encore failed to review information that would have been necessary to have a reasonable basis to continue collecting on that account; or

    b.    Encore had knowledge or reason to believe, based on Encore's past course of dealing with the seller or the seller's accounts (including factors such as Consumer disputes, inaccurate or incomplete information in the portfolio, and contractual disclaimers related to the accounts) that a specific portfolio of the seller's accounts might contain unreliable data, but continued to represent that Consumers owed the claimed amount on the accounts in question without obtaining and reviewing additional information that would provide a reasonable basis for such claims.

105.    The representations set forth in Paragraph 103 are false or misleading and constitute deceptive acts or practices in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Misrepresenting that Encore Intends to Prove the Debt, If Contested

106.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Encore represented, directly or indirectly, expressly or by implication, that Encore intends to prove its claims, if contested.

107.    In truth and in fact, in numerous instances, Encore does not intend to prove its claims, if contested.

108.    The representations set forth in Paragraph 106 are false or misleading and

constitute deceptive acts or practices in violation of Sections 807, 807(5), and 807(10) of

the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).

### Filing Misleading Collection Affidavits

109.    In numerous instances, in connection with collecting or attempting to

collect Debt from Consumers, in affidavits filed in courts across the country, Encore

represented directly or indirectly, expressly or by implication, that:

  a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are
        presumed valid by a court;
  b.    Encore affiants had reviewed account-level documentation from the original
        Creditor corroborating the Consumer's Debt;
  c.    Debt seller affiants had reviewed hard copy records corroborating the
        Consumer's Debt;
  d.    Documents attached to affidavits were specific to the Consumer; or
  e.    Encore affiants had personal knowledge of the individual Consumer's
        indebtedness.

110.    In truth and in fact:

  a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are not
        presumed valid by a court, because pursuant to Section 809(c) of the
        FDCPA, "[t]he failure of a consumer to dispute the validity of a debt [after
        receiving a notice under Section 809] may not be construed by any court as
        an admission of liability by the consumer";
  b.    In numerous instances, Encore affiants had not reviewed account-level
        documentation from the original Creditor corroborating the Consumer's
        Debt;
  c.    In numerous instances, Debt seller affiants had not reviewed hard copy
        records corroborating the Consumer's Debt;

d.  In numerous instances, Documentation attached to affidavits was not specific to the Consumer; and

e.  In numerous instances, Encore affiants did not have personal knowledge of the individual Consumer defendant's indebtedness.

111.  The representations set forth in Paragraph 109 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

## Misrepresentations Regarding Time-Barred Debt

112.  In numerous instances, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

113.  In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

114.  The representations set forth in Paragraph 112 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10).

## Misrepresenting to Consumers That They Have the Burden of Proof in Litigation

115.  In numerous instances, in connection with collecting or attempting to collect Debt through litigation or threats of litigation, Encore represented to Consumers, directly or indirectly, expressly or by implication, that under the FDCPA, the failure to dispute a Debt in writing within a certain period of time shifts the legal burden to Consumers to prove in court that they do not owe a Debt to Encore.

Page 28 of 63

116.    In truth and in fact, under the FDCPA, the failure to dispute a Debt in writing within a certain period of time does not shift the legal burden to Consumers to prove in court that they do not owe a Debt.

117.    The representations set forth in Paragraph 115 are false or misleading and constitute a deceptive act or practice in violation in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Assigning Disputed Debt to Third Parties
### Without Communicating that the Debt is Disputed

118.    In numerous instances, in connection with collecting or attempting to collect Debt, Encore communicated disputed credit information to third-party collection agencies, including law firms, without communicating that the Debt is disputed.

119.    The representations set forth in Paragraph 118 are false or misleading and constitute violations of Sections 807 and 807(8) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(8).

### Excessive Calls

120.    In numerous instances, in connection with collecting or attempting to collect Debt, Asset made an excessive number of telephone calls and engaged in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a Debt.

121.    The acts or practices set forth in Paragraph 120 are harassing or abusive and constitute violations of Sections 806 and 806(5) of the FDCPA, 15 U.S.C. §§ 1692d, 1692d(5).

### Calls at Inconvenient Times

Page 29 of 63

122.    In numerous instances, in connection with collecting or attempting to collect Debt, Asset called certain Consumers at unusual times or at a time which Asset should have known would be inconvenient.

123.    The representations set forth in Paragraph 122 constitute violations of Sections 805(a)(1) of the FDCPA, 15 U.S.C. § 1692c(a)(1).

## Violation of the Fair Credit Reporting Act

124.    Section 623 (b)(1)(A) of the FCRA makes it unlawful for a furnisher of information to a Consumer reporting agency, upon receiving notice of a Consumer dispute from the Consumer reporting agency, not to conduct a reasonable investigation of the disputed information. 15 U.S.C. § 1681s-2(b).  Section 623(a)(8)(E) of the FCRA makes it unlawful for such a furnisher not to conduct a reasonable investigation of a Consumer dispute received directly from the Consumer, in the circumstances specified by Regulation V.  15 U.S.C. § 1681s-2(a)(8)(E); 12 C.F.R. 1022.43.

125.    Midland, MCM, and Encore Capital each "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies" about the Encore's "transactions or experiences" with Consumers, as described in Section 623(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(2)(A), and are each a "furnisher" as defined in Regulation V, 12 C.F.R. 1022.44(c).

## Failing to Adequately Investigate Disputes

126.    In numerous instances, Encore failed to conduct reasonable investigations of Consumer disputes under the FCRA for accounts that had not been disputed within 45 days of Encore sending the Consumer a Notice of Debt under Section 809 of the FDCPA.

127.    The acts or practices alleged in Paragraph 126 constitute violations of
Sections 623(a)(8)(E) and (b)(1)(A) of the FCRA, 15 U.S.C. §§ 1681s-2(a)(8)(E) and (b).

## ORDER

## VI

## Conduct Provisions

**IT IS ORDERED, under Sections 1053 and 1055 of the CFPA, that:**

128.    Respondent and its officers, agents, servants, employees, and attorneys who
have actual notice of this Consent Order, whether acting directly or indirectly, may not
violate Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1);
Sections 805(a)(1), 806, 806(5), 807, 807(2)(A), 807(5), 807(8), and 807(10) of the
FDCPA, 15 U.S.C. §§ 1692c(a)(1), 1692d, 1692d(5), 1692e, 1692e(2)(A), 1692(5), 1692(8),
and 1692(10);  Sections 623(a)(8)(E) and 623(b) of the FCRA, 15 U.S.C. §§ 1681s-
2(a)(8)(E) and 1681s-2(b).

## PROHIBITION AGAINST COLLECTING DEBTS WITHOUT A REASONABLE BASIS

**IT IS FURTHER ORDERED** that:

129.    Encore, Encore's officers, agents, servants, employees, and attorneys, and
all other persons in active concert or participation with any of them, who receive actual
notice of this Consent Order, whether acting directly or indirectly, are permanently
restrained and prohibited from making any representation, expressly or by implication,
that a Consumer owes a Debt to Encore or as to the amount of a Debt owed or allegedly
owed to Encore unless, at the time of making the representation, Encore can substantiate
the representation. Without limiting the foregoing, such substantiation must include

Page 31 of 63

reviewing Original Account-Level Documentation reflecting the Consumer's name and the claimed amount, excluding any post Charge-off or post-judgment payments (unless the claimed amount is higher than the Charge-off Balance or judgment balance, in which case Encore must review (i) Original Account-Level Documentation reflecting the Charge-off Balance or judgment balance and (ii) an explanation of how the claimed amount was calculated and why such increase is authorized by the agreement creating the Debt or permitted by law), under any of the following circumstances:

    a.  The Consumer disputed, orally or in writing, the accuracy or validity of the Debt;

    b.  The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective representations and warranties as to the  accuracy or validity of the Debt;

    c.  The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective commitments to provide Original Account-Level Documentation during the time period in which Encore is collecting the Debt; or

    d.  The Debt was purchased in a portfolio, after the Effective Date, which Encore knows contains unsupportable or materially inaccurate information about any Debt, based on either of the following factors:

        i.  At any time during the preceding twelve months, a Consumer disputed, orally or in writing, the accuracy or validity of a Debt in the portfolio and Encore sought but was unable to obtain Original

Account-Level Documentation reflecting the amount of the Debt or the identity of the person responsible for the Debt, unless Encore can establish, based on a documented and thorough review of Original Account-Level Documentation concerning other accounts in the portfolio, that the inability to obtain Original Account-Level Documentation to support the account in the portfolio was an anomaly; or

ii. Original Account-Level Documentation produced to Encore, by a Debt seller or a Consumer, reflected information about the amount of the Debt or the identity of the person responsible for the Debt that was inconsistent and irreconcilable with information previously provided to Encore by the Debt seller, unless Encore can establish, based on a documented and thorough review of Original Account-Level Documentation concerning other accounts in the portfolio, that the production of inaccurate or inconsistent information concerning the account in the portfolio was an anomaly.

Notwithstanding the foregoing, Encore is not required pursuant to this Paragraph to (i) refuse to accept any payments voluntarily submitted by Consumers; (ii) suspend collections for Consumers who have acknowledged the Debt and agreed to make payments; or (iii) refuse to communicate with a Consumer who affirmatively contacts Encore (or Encore's agents) or requests contact from Encore (or Encore's agents) to discuss the Consumer's account.

Page 33 of 63

## PROHIBITION AGAINST SELLING DEBT

**IT IS FURTHER ORDERED** that:

130.     Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from reselling Debt to anyone other than (i) the entity that initially sold the Debt to Encore or to the Creditor; (ii) to a subsidiary or affiliate of Encore that is subject to the terms of this Consent Order (either by operation of law or by agreement); (iii) to any entity that is subject to  the terms of this Consent Order as part of an  acquisition  or merger with Encore, or purchase of all or substantially all of Encore's assets; or (iv) Encore's (or its affiliates) creditors or any agent of such creditors  (in each case, solely in their capacity as such) in settlement or satisfaction of any claims under, or in connection with the default or remedial provisions of, any relevant loan or lending agreement.

## PROHIBITION AGAINST THREATENING OR FILING COLLECTION LAWSUITS WITHOUT AN INTENT TO PROVE THE DEBT, IF CONTESTED

**IT IS FURTHER ORDERED** that:

131.     Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

      a.  Initiating a Legal Collection lawsuit unless in possession of the

following:

i.  Original Account-Level Documentation reflecting, at a minimum, the Consumer's name, the last four digits of the account number associated with the Debt at the time of Charge-off, the claimed amount, excluding any post Charge-off payments (unless the claimed amount is higher that the Charge-off Balance, in which case Encore must possess (i) Original Account-Level Documentation reflecting the Charge-off Balance and (ii) an explanation of how the claimed amount was calculated and why such increase is authorized by the agreement creating the Debt or permitted by law), and if Encore is suing under a breach of contract theory, the contractual terms and conditions applicable to the Debt;

ii.  A chronological listing of the names of all prior owners of the Debt and the date of each transfer of ownership of the Debt, beginning with the name of the Creditor at the time of Charge-off;

iii.  A certified or otherwise properly authenticated copy of each bill of sale or other document evidencing the transfer of ownership of the Debt at the time of Charge-off to each successive owner, including Encore. Each of the documents evidencing the transfer of ownership of the Debt must include a specific reference to the particular Debt being collected upon; and

iv.  Any one of the following:

2015-CFPB-0022    Document 1    Filed 09/09/2015    Page 36 of 63

    1. A document signed by the Consumer evidencing the opening of the account forming the basis for the Debt; or

    2. Original Account-Level Documentation reflecting a purchase, payment, or other actual use of the account by the Consumer.

b. Engaging in any Legal Collection without providing the Consumer with certain information about the Debt, unless previously provided, including but not limited to, the following information:

    i. the name of the Creditor at the time of Charge-off, including the name under which the Creditor did business with the Consumer;

    ii. the last four digits of the account number associated with the Debt at the time of the Consumer's last monthly account statement, or, if not available, at the time of Charge-off;

    iii. the Charge-off Balance;

    iv. Encore's method of calculating any amount claimed in excess of the Charge-off Balance; and

    v. A statement that Encore, or Encore's agent, will, within 30 days of a written request, provide the Consumer with copies of the documentation referenced in Subsection (a) of this Paragraph, at no cost. *Provided that,* Encore has to provide such documentation upon request only once per year and that Encore is not required to provide such documentation in response to a request made more than one year after Encore has ceased collecting the Debt.

Page 36 of 63

**PROHIBITION AGAINST FILING FALSE OR MISLEADING AFFIDAVITS**

**IT IS FURTHER ORDERED** that:

132.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with collection of a Debt:

   a. Submitting any affidavit in which the affiant represents, expressly or by implication, that the affidavit has been notarized if the affidavit was not executed in the presence of a notary;

   b. Submitting any affidavit containing an inaccurate statement, including but not limited to a statement that attached documentation relates to the specific Consumer being sued when that is not the case;

   c. Submitting any affidavit in which the affiant represents, expressly or by implication, that any attached or unattached documents or records concerning the Debt forming the basis for the lawsuit have been reviewed by the affiant, when that is not the case;

   d. Submitting any affidavit in which the affiant represents, expressly or by implication, that the affiant has personally reviewed the affidavit, when that is not the case;

   e. Submitting any affidavit which references a Consumer's failure to dispute a Debt unless the affidavit also contains the following statement:

> Under Federal law, "[t]he failure to dispute a debt under [Section 809(c) of the Fair Debt Collection Practices Act, 15 U.S.C. §1692g(c)] may not be considered by any court as an admission of liability."

## PROHIBITION AGAINST DECEPTIVELY COLLECTING TIME-BARRED DEBT

**IT IS FURTHER ORDERED** that:

133.   Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

a. Collecting or attempting to collect any Time-Barred Debt through litigation or arbitration;

b. Collecting or attempting to collect any Time-Barred Debt through any means, including but not limited to telephone calls and written communications, without clearly and prominently disclosing to the Consumer:

   i. for those Consumer accounts where the Debt is Time-Barred and generally cannot be included in a Consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), but can be collected through other means pursuant to applicable state law, Encore will include the following statement: "The law limits how long you can be sued on a debt and how long a debt can appear on your credit report. Due to the age of this debt, we will not sue you for it or report

2015-CFPB-0022    Document 1    Filed 09/09/2015    Page 39 of 63

            payment or non-payment of it to a credit bureau;" and

    ii. for those Consumer accounts where the Debt is Time-Barred but can
be collected through other means pursuant to applicable state law,
and may be included in a Consumer report under the provisions of
the FCRA, 5 U.S.C. § 1681c(a), Encore will include the following
statement: "The law limits how long you can be sued on a debt.
Because of the age of your debt, we will not sue you for it."

Provided, however, that with regard to telephonic communications,
Encore is not required to make either disclosure to any individual
person more than once per 30 day period.

    c. Making any representation or statement, or taking any other action that
interferes with, detracts from, contradicts, or otherwise undermines the
disclosures required in Paragraph (b) of this Section.

Encore will be deemed to have complied with the disclosure requirements of this
Paragraph if it makes a disclosure to Consumers in a specific jurisdiction that (i) is
required by the laws or regulations of that jurisdiction, (ii) complies with those laws or
regulations, and (iii) is substantially similar to the disclosure required by this Paragraph.

### PROHIBITION AGAINST FAILING TO COMMUNICATE DISPUTES

**IT IS FURTHER ORDERED** that

134.    Encore, Encore's officers, agents, servants, employees, and attorneys, and
all other persons in active concert or participation with any of them, who receive actual
notice of this Consent Order, whether acting directly or indirectly, are permanently

restrained and prohibited from communicating any information about a Debt that Encore

knows or should know is disputed, to any person without informing such person that the

Debt is disputed, including but not limited to communications with third-party collection

agencies, law firms employed by Encore, or Consumer reporting agencies provided,

however, that Encore is not required by this Consent Order to provide oral notification

under this Sub-Paragraph to any individual person more than once per 30 day period.

**PROHIBITION AGAINST EXCESSIVE
AND INCONVENIENT TELEPHONE CALLS**

**IT IS FURTHER ORDERED** that

135.    Encore, Encore's officers, agents, servants, employees, and attorneys, and

all other persons in active concert or participation with any of them, who receive actual

notice of this Consent Order, whether acting directly or indirectly, are permanently

restrained and prohibited from:

a.  Engaging in any conduct the natural consequence of which is to harass,

oppress, or abuse a person, including, but not limited to: (1) the use of

obscene or profane language or language the natural consequence of

which is to abuse the hearer; (2) causing a telephone to ring, or engaging

a person in telephone conversation, repeatedly or continuously with the

intent to annoy, abuse, or harass the person at the called number; (3)

placing more than one call to any person about a Debt after that person

has notified Encore either orally or in writing that the person wishes

Respondent to cease further communication with the person; and

Page 40 of 63

b.  Communicating with any Consumer at a time or place known by Encore or which should be known by Encore to be inconvenient to the Consumer. In the absence of knowledge of circumstances to the contrary, Encore must assume that the convenient time for communicating with a Consumer is after 8:00 a.m. and before 9:00 p.m., local time at the Consumer's location. In the absence of knowledge of circumstances to the contrary, Encore must assume that the Consumer is located in the local time-zone associated with the United States Postal Service postal code associated with the Consumer's address or in the local time-zone associated with the area code associated with the Consumer's telephone number being dialed.  In the event that Encore is in possession of conflicting location information, Encore must assume that it would be inconvenient to contact the Consumer before 8:00 a.m. or after 9:00 p.m., local time in either location.

## VII

### Compliance Plan

**IT IS FURTHER ORDERED** that:

136.    Within 60 days from the Effective Date, Encore must submit to the Enforcement Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Encore's Debt collection practices comply with all applicable Federal Consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

    a. comprehensive, written policies and procedures designed to prevent violations of Federal Consumer protection laws and prevent associated risks of harm to Consumers;

    b. comprehensive, written policies and procedures designed to ensure that Encore conducts due diligence regarding the accuracy of the information it acquires from Creditors or other Debt buyers;

    c. comprehensive, written policies and procedures designed to insure that law firms engaged by Encore to collect Debt do not violate any Consumer financial protection laws that must include at a minimum:

        i. an analysis to be conducted by Encore, prior to Encore entering into a contract with the law firm, of the ability of the law firm to perform its obligations in compliance with all applicable Federal Consumer financial laws and Encore's related policies and procedures;

        ii. for new and renewed contracts, a written contract between Encore and the law firm, which sets forth the responsibilities of each party, including:

            1. the law firm's specific performance responsibilities and duty to maintain adequate internal controls;

            2. the law firm's duty to provide adequate training on compliance with all applicable Federal Consumer financial laws and Encore's related policies and procedures;

            3. the law firm's duty to alert Encore whenever a

Consumer submits an oral or written dispute or asserts a defense to a lawsuit, including but not limited to a dispute concerning the accuracy or validity of the Debt or any assertion that the suit was filed outside of the applicable statute of limitations;

4. Encore's authority to conduct periodic onsite reviews of the law firm's controls, performance, and information systems related to Debt collection;

5. Encore's right to terminate the contract if the law firm materially fails to comply with the terms specified in the contract, including the terms required by this Paragraph; and

6. periodic review by Encore of the law firm's controls, performance, and information systems related to Debt collections.

d. an effective training program that includes regular, specific, comprehensive training in Consumer protection laws commensurate with individual job functions and duties for appropriate employees, including all employees having responsibilities that relate to Consumer protection laws, senior management and members of the Board;

e. an enhanced and well-documented internal CMS monitoring process incorporated into the daily work of Encore's employees that is designed

to detect and promptly correct compliance weaknesses of Encore and its service providers, particularly weaknesses that impact Consumers;

f.  an effective Consumer complaint monitoring process, including the maintenance of adequate records of all written, oral, or electronic complaints or inquiries, formal or informal, received by Encore and its service providers and the resolution of the complaints and inquiries; and

g.  effective independent audit coverage of the Compliance Program and Encore's compliance with all Consumer protection laws and internal policies and procedures

137.    The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Encore to revise it. In the event that the Enforcement Director directs Encore to revise the Compliance Plan, Encore must make the revisions and resubmit the Compliance Plan to the Enforcement Director within 30 days.

138.    After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Encore must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

139.    Notwithstanding the foregoing, Encore must take whatever steps necessary to fully implement all of the requirements and restrictions described in Paragraphs 129 and 131 within 180 days of the Effective Date and all of the requirements and restrictions described in Paragraphs 132, 133, and 134 within 90 days of the Effective Date.

# VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

140.   The Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

141.   Although this Consent Order requires Encore to submit certain documents for the review or non-objection by the Enforcement Director, the Board must have the ultimate responsibility for proper and sound management of Encore and for ensuring that Encore complies with Federal Consumer financial law and this Consent Order.

142.   In each instance that this Consent Order requires the Board to ensure adherence to, or undertake to perform certain obligations of Encore, the Board must:

    a.   Authorize whatever actions are necessary for Encore to fully comply with the Consent Order;

    b.   Require timely reporting by management to the Board on the status of compliance obligations; and

    c.   Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

# IX

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

143.    Within 10 days of the Effective Date, Encore must reserve or deposit into a segregated deposit account an amount not less than $34,000,000 or greater than $42,000,000, for the purpose of providing redress to Restitution Eligible Consumers as required by this Consent Order. If the total of payments to Restitution Eligible Consumers is less than $34,000,000, the excess must be deposited into the U.S. Treasury as disgorgement. Except for as provided by Paragraph 147, if the total of payments to Restitution Eligible Consumers would be greater than $42,000,000, the amount that would be paid to each Restitution Eligible Consumer may be reduced pro rata.

144.    For the approximately 12,000 identified Consumers who during the Relevant Time Period paid on a Debt within sixty days of being sent a letter that sought payment of a Time-Barred Debt, and that included the word "settlement," and it was not affirmatively disclosed in that letter that the Consumer would not be sued for non-payment, Encore must provide full restitution ("Time-Barred Debt Restitution"), expected to total approximately $5,300,000, of all payments made, directly or indirectly, during the Relevant Time Period within sixty days of the Consumer being sent a letter that sought payment of a Time-Barred Debt that included the word "settlement" and did not include an affirmative disclosure in that letter that the Consumer would not be sued for non-payment.

145.    For the approximately 35,600 identified Consumers who paid on a Debt after an affidavit with a representation that the Debt could be assumed valid because the Consumer failed to dispute under the FDCPA was submitted in court, Encore must provide restitution ("Dispute Affidavit Restitution"), expected to total approximately

$36,000,000, as follows:

      a.    For the approximately 6,300 identified Consumers who may have been sued by Encore in a lawsuit in which Encore filed an affidavit with a representation that the Debt could be assumed valid because the Consumer failed to dispute under the FDCPA ("Dispute Affidavit Lawsuit") and for which it does not possess documentation evidencing the Consumer's responsibility for the Debt, Encore must provide full restitution, expected to total approximately $12,600,000, of all payments made, directly or indirectly, to Encore during the Relevant Time Period, after Encore filed the Dispute Affidavit.

      b.    For the approximately 29,300 identified Consumers who may have been sued by Encore in a Dispute Affidavit Lawsuit and for which Encore possesses documentation evidencing the Consumer's responsibility for the Debt, Encore must provide full restitution up to $1,000 each, expected to total approximately $23,300,000, of all payments made, directly or indirectly, to Encore during the Relevant Time Period, after Encore filed the Dispute Affidavit.

146.    For the Dispute Affidavit Lawsuit Debt that has yet to be collected, expected to total more than $125,000,000, Encore must within 90 days of the Effective Date:

      a.  Withdraw, dismiss, or terminate all pending Dispute Affidavit Lawsuits;

      b.  Release or move to vacate all judgments obtained during the Relevant Period regarding Dispute Affidavit Lawsuits;

    c.  Cease post-judgment enforcement activities and cease accepting settlement payments related to any Dispute Affidavit Lawsuits; and

    d.  Request that the Consumer reporting agencies amend, delete, or suppress information regarding any Dispute Affidavit Lawsuits, and associated judgments, as applicable.

147.    In addition to the Dispute Affidavit Restitution required by this Section, Encore must, within 180 days of the Effective Date, refund any payments made within the 30 days prior to the Effective Date, and any time after the Effective Date, on Debts associated with any Dispute Affidavit Lawsuit, regardless of whether such refunds would cause Encore to pay more than $42,000,000 in total restitution.

## Redress Plan

148.    Within 60 days of the Effective Date, Encore must prepare and submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director must have the discretion to make a determination of non-objection to the Redress Plan or direct Encore to revise it. In the event that the Enforcement Director directs Encore to revise the Redress Plan, Encore must make the revisions and resubmit the Redress Plan to the Enforcement Director within 15 days. Upon notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Encore must implement and adhere to the steps, recommendations, deadlines, and timeframes set forth in the Redress Plan.

149.    With respect to Time-Barred Debt Restitution, the Redress Plan must

2015-CFPB-0022    Document 1    Filed 09/09/2015    Page 49 of 63

include: (1) the form of the letter ("Time-Barred Debt Redress Notification Letter") to be sent notifying Restitution Eligible Consumers of the redress; and (2) the form of the envelope that will contain the Time-Barred Debt Redress Notification Letter. The letter must include language explaining the manner in which the amount of redress was calculated; a statement that the provision of refund payment is in accordance with the terms of this Consent Order; and a statement that accepting payment of redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Time-Barred Debt Redress Notification Letter any materials other than the approved letters and redress checks, unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

150.    With respect to Dispute Affidavit Restitution, the Redress Plan must include: (1) the process by which Encore will conduct the file review of the approximately 35,600 identified Consumers who may have been sued by Encore in a Dispute Affidavit Lawsuit; (2) the form of the letter ("Dispute Affidavit Restitution Notification Letter") to be sent notifying Restitution Eligible Consumers of the redress; and (3) the form of the envelope that will contain the Dispute Affidavit Restitution Notification Letter. The letter must include language explaining the manner in which the amount of redress was calculated; a statement that the related Dispute Affidavit Lawsuit has been withdrawn, dismissed, vacated, terminated, released, or that the enforcement activities on the Dispute Affidavit Lawsuit have ceased, as applicable; a statement that the redress being provided is in accordance with the terms of this Consent Order; and a statement that

accepting payment of redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Dispute Affidavit Restitution Notification Letter any materials other than the approved letters and redress checks, unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

151.    With respect to Dispute Affidavit Lawsuits and associated judgments that did not result in a Consumer making a payment directly or indirectly to Encore, the Redress Plan must include: (1) the form of the letter ("Lawsuit Dismissal/Judgment Non-enforcement Notification Letter") to be sent notifying eligible Consumers of the withdrawal, dismissal, vacation, termination, release of the Dispute Affidavit Lawsuit or the cessation of enforcement activities on the Dispute Affidavit Lawsuit and associated judgment, as applicable; and (2) the form of the envelope that will contain the Lawsuit Dismissal/Judgment Non-enforcement Notification Letter. The letter must include a statement that the Dispute Affidavit Lawsuit has been withdrawn, dismissed, vacated, terminated, released, or that the enforcement activities on the Dispute Affidavit Lawsuit have ceased, as applicable; a statement that the redress is in accordance with the terms of this Consent Order; and a statement that the redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Lawsuit Dismissal/Judgment Non-enforcement Notification Letter any materials other than the approved letter; unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the

inclusion of such additional materials.

152. The Redress Plan must include a description of the following:

    a. methods used and the time necessary to compile a list of Restitution Eligible Consumers and the approximately 50,000 identified Consumers who will receive a Lawsuit Dismissal/Judgment Non-enforcement Notification Letter;

    b. methods used to calculate the amount of redress to be paid to each Restitution Eligible Consumer as required herein;

    c. procedures for issuance and tracking of redress to Restitution Eligible Consumers;

    d. methods and procedures used and the time necessary to withdraw, dismiss, move to vacate, terminate, or release the Dispute Affidavit Lawsuits and associated judgments, or to cease enforcement activities on Dispute Affidavit Lawsuit judgments;

    e. procedures for monitoring compliance with the Redress Plan;

    f. the process for providing restitution for Restitution Eligible Consumers, which must include the following requirements:

        i. Encore must mail a check to any Restitution Eligible Consumer along with a Redress Notification Letter;

        ii. Encore must send the check by United States Postal Service first-class mail, address correction service requested, to the Restitution Eligible Consumer's last address as maintained by Encore's records;

      iii. Encore must make reasonable attempts to obtain a current address for any Restitution Eligible Consumer whose Redress Notification Letter and restitution check is returned for any reason, using the National Change of Address System, and must promptly re-mail all returned letters and restitution checks to current addresses. If the check for any Restitution Eligible Consumer is returned to Encore after such second mailing by Encore, or if a current mailing address cannot be identified using National Change of Address System, Encore must retain the restitution amount of such Eligible Consumer for a period of three-hundred sixty (360) days from the date the restitution check was originally mailed, during which period such amount may be claimed by such Restitution Eligible Consumer upon appropriate proof of identity. After such time these monies will be deposited into the U.S. Treasury as disgorgement.

153.    The Redress Plan will allow for a reduction in the amount of any payments previously refunded to a Restitution Eligible Customer by Encore prior to the Effective Date.

154.    If Encore claims to have made any restitution prior to the Effective Date of this Consent Order that complies with the requirements of this Consent Order, Encore must provide appropriate proof of such restitution to the Enforcement Director.

155.    Encore must not condition the payment of any redress to any Restitution Eligible Consumer under this Consent Order on that person's agreement to any condition,

such as the waiver of any right.

## **Assessment of Redress**

156.    Encore must retain at its own expense the services of an independent
certified accounting firm ("Firm"), within 15 days after the Enforcement Director's non-
objection pursuant to Paragraph 150, to determine compliance with the Redress Plan.
The Firm must determine compliance in accordance with the attestation standards
established by the American Institute of Certified Public Accountants for agreed-upon
procedures for engagements.

157.    Prior to engagement, and no later than 60 days from the Effective Date,
Encore must submit the name and qualifications of the Firm, together with the proposed
engagement letter with the Firm and the proposed agreed-upon procedures, to the
Enforcement Director for non-objection. Within 15 days after submission of the Firm's
name, the Enforcement Director must notify Encore in writing of the CFPB's objection or
non-objection thereto.

158.    The Firm must prepare a detailed written report of its assessment of
Encore's compliance with the terms of the Redress Plan ("Restitution Report"). The
Restitution Report must include an assessment of the Redress Plan and the methodology
used to determine the population of Restitution Eligible Consumers, the amount of
redress for each Restitution Eligible Consumer, the procedures used to issue and track
redress payments, and the work of any independent consultants that Encore has used to
assist and review its execution of the Redress Plan.

159.    The Firm must submit the Restitution Report to the Enforcement Director

and the Board within 90 days after Encore completes implementation of the Redress Plan.

## X

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

160.    Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking into account the factors set forth in 12 U.S.C. § 5565(c)(3), Encore must pay a civil money penalty of $10,000,000 to the Bureau, as directed by the Bureau and as set forth herein.

161.    Within 10 days of the Effective Date, Encore must pay the civil money penalty in the form of a wire transfer to the Bureau or to such agent as the Bureau may direct, and in accordance with wiring instructions to be provided by counsel for the Bureau.

162.    The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau in accordance with Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

163.    Encore must treat the civil money penalty as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Encore must not:

> a.  Claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any civil money penalty that Encore pays under this Consent Order; or

Page 54 of 63

    b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil money penalty that Encore pays under this Consent Order.

164.    To preserve the deterrent effect of the civil money penalty, in any Related Consumer Action, Encore must not argue that Encore is entitled to, nor must Encore benefit by, any offset or reduction of any monetary remedies imposed in the Related Consumer Action, because of the civil money penalty paid in this action ("Penalty Offset"). If the court in any Related Consumer Action grants such a Penalty Offset, Encore must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment must not be deemed an additional civil money penalty and must not be deemed to change the amount of the civil money penalty imposed in this action.

## XI

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

165.    In the event of any default on Encore's obligations to make payment under this Consent Order, interest, computed pursuant to 28 U.S.C. § 1961, as amended, must accrue on any outstanding amounts not paid from the date of default to the date of payment, and must immediately become due and payable.

166.    Encore must relinquish all dominion, control, and all legal and equitable right, title, and interest to the funds paid to the fullest extent permitted by law and no

part of the funds must be returned to Encore.

167.    In accordance with 31 U.S.C. § 7701, Encore, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

168.    Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Encore must notify the Enforcement Director of the final judgment, consent order, or settlement in writing.  That notification must indicate the amount of redress, if any, that Encore  paid or is required to pay to Consumers and should describe the Consumers or classes of Consumers to whom that redress has been or will be paid.

## XII

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

169.    Encore must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; any claims made under, or in connection with a default or remedial provision of a loan or lending agreement under Paragraph 130(iv); the filing of any bankruptcy or insolvency proceeding by or against Encore; or a change in Encore's name or address.

170.    Encore must report any change in the information required to be submitted under Paragraph 169 at least 30 days prior to such change. Provided, however, that with respect to any proposed change about which Encore learns less than 30 days prior to the date such action is to take place, Encore must notify the Bureau as soon as is practicable after obtaining such knowledge.

171.    Within 180 days of the Effective Date, and again one year after the Effective Date, Encore must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report), which has been approved by the Board, which, at a minimum:

      a.  Describes in detail the manner and form in which Encore has complied with this Consent Order; and

      b.  Attaches a copy of each Consent Order acknowledgment obtained under Section XIII of this Consent Order, unless previously submitted to the Bureau.

## XIII

## Order Distribution and Acknowledgement

**IT IS FURTHER ORDERED** that:

172.    Within 30 days of the Effective Date, Encore must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

173.    For five years from the Effective Date, Encore must deliver a copy of this

Consent Order to any business entity resulting from any change in structure as set forth in Section XII, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

174.    Encore must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, with any electronic signatures complying with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

# XIV

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

175.    Encore must create, for at least 5 years from the Effective Date, the following business records:

> a.  All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;
>
> b.  All documents and records pertaining to the Redress Program, as set forth in Section IX; and
>
> c.  Copies of all templates used to collect Debt, including but not limited to dunning letters and affidavits.

176.    Encore must retain the documents identified in Paragraph 175 for at least 5

years.

177.    Encore must make the documents identified in Paragraph 175 available to the Bureau upon the Bureau's request.

## XV

## Notices

178.    Unless otherwise directed in writing by the Bureau, Encore must provide all submissions, requests, communications, consents, or other documents relating to this Consent Order, in writing with the subject line, "*In Re Encore,* File No. 2015-CFPB-___.," and send them either:

    a.  By overnight courier (not the U.S. Postal Service), as follows:

    Assistant Director for Enforcement
    Consumer Financial Protection Bureau
    1625 I Street, NW
    Washington, DC 20006; or

    b.  By first class mail to the below address and contemporaneously sent by email to Enforcement_Compliance@CFPB.gov:

    Assistant Director for Enforcement
    Consumer Financial Protection Bureau
    1700 G Street, NW
    Washington, DC 20552

## XVI

## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Encore's compliance with this Consent Order:

179.    Within 14 days of receipt of a written request from the Bureau, Encore must submit additional compliance reports or other requested information, which must be

Page 59 of 63

made under penalty of perjury; provide sworn testimony; or produce documents.

180.    For purposes of this Section, the Bureau may communicate directly with Encore, unless Encore asks the Bureau in writing to communicate through retained counsel.

181.    Encore must permit Bureau representatives to interview any employee or other person affiliated with Encore who has agreed to such an interview. The person interviewed may have counsel present.

182.    Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII

## Modifications and Extensions of Time

183.    Encore may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

184.    The Enforcement Director may, in his or her discretion, modify any non-material provisions of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements), if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

185.    Upon a written showing of good cause, the Enforcement Director may modify any provision of this Consent Order to the extent that compliance with that provision could cause Encore, its Board, officers, or employees to violate any law, rule, or regulation, including but not limited to any subsequent amendments of the CFPA, FCRA,

or FDCPA.

186.    In the event that Encore acquires an entity, a line of business from an entity, or an ownership stake in an entity (an "Acquired Entity") in the business of the purchase, transfer, or collection of Debts in the United States, the Acquired Entity will have a transition period of 90 days to comply with the requirements of this Consent Order. Any asset purchase in which Encore acquires and continues to use the operational or servicing systems of a legacy entity not previously owned by Encore will be treated as an Acquired Entity for the purpose of this provision. Any Debt that Encore acquires as a result of its acquisition of an Acquired Entity or an ownership stake in an Acquired Entity will be considered purchased on the date the Acquired Entity purchased the Debt.

## XVIII

## Administrative Provisions

**IT IS FURTHER ORDERED** that:

187.    The provisions of this Consent Order will not bar, estop, or otherwise prevent the Bureau or any other governmental agency from taking any other action against Encore.

188.    The Bureau releases and discharges Encore from all potential liability for violations of law that the Bureau has or might have been asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices alleged in the Consent Order in future enforcement actions against Encore and its affiliates, including, without limitation, to establish a pattern or practice of

2015-CFPB-0022     Document 1     Filed 09/09/2015     Page 62 of 63

violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the terms and provisions of the Consent Order, or to seek penalties for any violation thereof.

189.    This Consent Order does not form, and may not be construed to form, a contract binding the Bureau or the United States.

190.    This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Encore. If such action is dismissed or the relevant adjudicative body rules that Encore did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

191.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

192.    Should Encore seek to transfer or assign all or part of its operations or assets that are subject to this Consent Order, Encore must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

193.    The provisions of this Consent Order will be enforceable by the Bureau. For

any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondents wherever Respondents may be found and Respondents may not contest that court's personal jurisdiction over Respondents.

194.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

195.    Nothing in this Consent Order may be construed as allowing Encore, its Board, officers, or employees to violate any law, rule, or regulation.

SO ORDERED this _3ʳᵈ_ day of ___September___, 2015.

_Richard Cordray_
Richard Cordray
Director
Consumer Financial Protection Bureau

Page 63 of 63